**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION - CINCINNATI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:19-cr-86 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| DONALD TORAN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

**ORDER DENYING MOTION TO SUPPRESS (Doc. 66) AND MOTION TO
DISMISS (Doc. 70)**

---

This case is before the Court on Defendant Donald Toran's (1) motion to

suppress (Doc. 66) and (2) motion to dismiss (Doc. 70). For the reasons below, both

motions are hereby **DENIED**.

## FACTS

On July 16, 2018, DEA agents initiated surveillance in the parking lot of the

Wimbleton Plaza Shopping Center—an area known for drug dealing. At approximately

2:41 PM, the agents noted a silver 2013 Honda Accord sitting in the parking lot with

three male occupants. The driver (later identified as co-defendant Deondrea Chambers)

was seen opening the car door and looking around as if trying to find someone. One

agent attested that, when Chambers opened the car door, he observed a white bag on

the driver's floorboard that he believed contained contraband. Chambers closed the

door and, a few moments later, pulled the Honda up beside the DEA agent's vehicle,

looked inside, and then drove to the south end of the parking lot and backed into a

parking spot. A few minutes later, Chambers got out of the car and greeted an

unknown man. The two then walked into a fast-food restaurant together. Five minutes

later, Chambers left the restaurant alone. As he was walking out, the Honda (now

driven by Toran) came from the other end of the parking lot to pick him up. Based on

their observations of the men's behavior, the DEA agents believed that a drug

transaction had just occurred. So, they decided to continue surveillance of the Honda as

it drove through town.

At this point, the DEA requested the help of Ohio State Highway Patrol Trooper

David Theobald.[1] Trooper Theobald ran the Honda's license plate and noted that it was

registered to Donald Toran. But Toran's Ohio driver's license was expired. Trooper

Theobald further noted that the Honda did not have a front license plate—a violation of

then existing Ohio law. After comparing the driver of the car with the BMV picture of

Toran, Trooper Theobald determined that Toran was indeed driving and decided to

initiate a traffic stop ("July 2018 Traffic Stop"). When Trooper Theobald stepped out of

his cruiser and approached Toran's vehicle, he immediately detected the

"overwhelming odor of burnt marijuana emanating from [it]." (Resp. in Op., Doc. 68,

Pg. ID # 195.) After Toran handed him his proof of insurance and an Arizona driver's

license, Trooper Theobald asked Toran to exit the vehicle, patted him down, and

secured him in the back of his cruiser. Trooper Theobald also noted that Toran was

_____

[1] Although the briefings refer to him as both Trooper "Theobald" and "Theobold," the Court will rely on the spelling of his name that he provided during the suppression hearing. (*See* Transcript, Doc. 69, Pg. ID # 203.)

wearing a GPS monitor on his ankle.

Meanwhile, a second OSHP officer, Trooper Doebrich, arrived on the scene as backup.  Trooper Doebrich witnessed Chambers manipulate something while sitting in the right rear passenger seat.  So, he ordered Chambers out of the vehicle and secured him in the back of his cruiser.  Trooper Theobald then ordered the third and final occupant (non-party Justin Toran) out of the front right passenger seat and conducted a pat down for weapons.  Trooper Theobald observed a bulge in Justin's groin area. Justin said that it was "nothing" but remained with Theobald while other OSHP troopers searched the vehicle.  The troopers discovered two marijuana blunts in the ashtray and a small clear plastic baggie containing an off-white powder.  Subsequent forensic tests confirmed that the powder was approximately 5.75 grams of a heroin/fentanyl mixture.  Justin was then secured and searched.  The bulge in his pants was discovered to be another clear plastic baggie containing what subsequent forensic tests confirmed was an additional 250 grams of a heroin/fentanyl mixture.

While being transported to the police station, Toran allegedly made "spontaneous, unsolicited statements" and admitted that the drugs in both the car and Justin's pants belonged to him.  (Resp. in Op., Doc. 68, Pg. ID # 195.)  Toran asked "several questions about grand jur[ies]" and "whether if he took the blame would the others get off?"  (*Id*.)  Toran later told the DEA agents that "the other two men, Chambers and Justin, were his brothers [and that] he bought the drugs prior to arriving at the parking lot."  (*Id*.)  Toran stated that, before Chambers met with the unknown man, they were trying to determine if the DEA agents conducting surveillance in the

parking lot were law enforcement. Toran further admitted that, when they were pulled over, "he handed the large bag of drugs to Justin to hide because [he] believed it was a routine traffic stop and that Justin would be fine concealing the drugs." (*Id*.)

Toran was subsequently indicted and charged with (1) narcotics conspiracy, (2) possession with intent to distribute, and (3) destruction of records in a federal investigation.[2]

Thereafter, Toran filed his motion to suppress (Doc. 66), seeking to exclude any and all evidence obtained as result of the traffic stop, as well as the statements he made afterwards. The government filed a response in opposition (Doc. 68), and, on June 1, 2021, the Court held a suppression hearing. During that hearing, Trooper Theobald testified that he was not wearing a body camera on the date of the traffic stop because, at that time, no officers in his department had been issued any. (Transcript, Doc. 69, Pg. ID # 205-208; 226-227.) Therefore, the only recording equipment that *would* have captured the events of the traffic stop were (1) the back-seat camera that captured the interior, prisoner compartment of his police cruiser; and (2) the front dash camera that would typically record through the front windshield. Trooper Theobald confirmed that the back-seat camera recorded video and audio of Toran once he was inside the prisoner compartment of the police cruiser. But he admitted that he was not aware of the existence of any video recordings from the front dash cam (which should have

---

[2] The day after being arrested, Toran (who was in custody) called his wife, co-defendant Kassandra Toran, and asked her to remotely erase his iPhone. (*See* Indictment, Doc. 5.) He provided passwords and instructions on how to do so, and subsequently followed up to confirm that she had. The next day, law enforcement obtained a search warrant and discovered that Toran's iPhone had in fact been erased. (*Id*.)

started recording automatically). Although he believes that the front dash cam

"malfunctioned and did not come on," he testified that its "possible, but unlikely" that

the video footage was "recorded but not preserved." (*Id*.) Trooper Theobald further

explained that, pursuant to department policy, all videos that are not designated as

evidence are deleted after a determinate period of time in order to free up space on the

server. So, when he recently contacted his supervisor (years after the July 2018 Traffic

Stop) and asked if any videos were recorded from the front dash cam or saved as

evidence, his supervisor replied that there were not.

In short, any video or audio footage from Trooper Theobald's front dash cam

that would have captured the July 2018 Traffic Stop was either not recorded or

automatically deleted pursuant to department policy. Toran therefore filed his second

motion (Doc. 70) seeking to have this case dismissed because (he contends) the

unavailability of the dash cam footage violates his due process rights and the

government's obligations under *Brady v. Maryland* and its progeny.

## ANALYSIS

The Court will first analyze Toran's motion to suppress before proceeding on to

his motion to dismiss.

## I. Motion to Suppress (Doc. 66)

In his first motion, Toran seeks to suppress all evidence obtained as a result of

the July 2018 Traffic Stop (*e.g.*, the contraband and his post-arrest statements). Since "an

ordinary traffic stop is more akin to an investigative detention rather than a custodial

arrest, the principles announced in *Terry v. Ohio,* 392 U.S. 1 (1968) apply to define the

scope of reasonable police conduct." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (cleaned up). In evaluating the constitutionality of a traffic stop, district courts must therefore engage in a two-part analysis: (1) "whether there was a proper basis for the stop"; and, if so, (2) "whether the degree of intrusion was reasonably related in scope to the situation at hand." *Id.*

Toran contests both prongs, arguing that the stop itself was improper and that the subsequent warrantless search of his vehicle was illegal. The Court disagrees.

**A. The Initial Stop was Proper**

It is well-settled that a police officer may lawfully stop a car when he has either probable cause to believe that a civil traffic violation has occurred or reasonable suspicion of an ongoing crime. *See United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). Here, Trooper Theobald had both.

*Probable Cause*. "[S]o long as [an] officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (citations omitted). "Probable cause to conduct a traffic stop is conferred where, as here, an officer observes a motorist violate a traffic law." *Id.* at 923. The Sixth Circuit has thus repeatedly held that the "fact that [a] license plate [is] not clearly displayed as required under [state law] provide[s] probable cause for the police officer to stop the vehicle." *United States v. Dycus*, 151 F. App'x 457, 461 (6th Cir. 2005); *see also United States v. Alexander*, 528 F. App'x 515, 518 (6th Cir. 2013) (officer had probable cause to stop a vehicle after observing a license plate violation); *United States v. Foster*,

6

65 F. App'x 41, 45 (6th Cir. 2003) (same); *United States v. Ferguson*, 8 F.3d 385, 392 (6th

Cir. 1993) (same); *see also, e.g., United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 879

(S.D. Ohio 2016).

And that is precisely what happened here. At the time of Toran's arrest, Ohio

law required all motor vehicles to display a license plate on both the *front* and rear of

the vehicle. *See* O.R.C. §4503.21(A)(1) ("No person who is the owner or operator of a

motor vehicle shall fail to display in plain view on the front and rear of the motor

vehicle a license plate. . ..") (effective June 30, 2017). Although this statute was recently

amended and now only requires that a license plate be displayed on a vehicle's rear, *see*

O.R.C. §4503.21(A)(1) (effective July 1, 2020), the front license plate requirement was

still very much in effect on the day that Toran was pulled over. So, when Trooper

Theobald observed Toran driving a vehicle without a front license plate, he

undoubtedly had probable cause to believe that a civil traffic violation was occurring.

The traffic stop was valid based on this reason alone.

Toran nevertheless contends that the stop was pretextual (and thus unlawful)

since the real reason he was pulled over was not for a minor traffic infraction, but rather

the suspected drug transaction the DEA had just observed. But it has long been the law

that, when a "traffic stop is supported by probable cause, an officer's subjective intent is

irrelevant." *Lott*, 954 F.3d at 922 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)

("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment

analysis.")); *see also United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (Murphy, J.)

("*Whren* puts an end to inquiries" like Toran's "about an officer's state of mind in

conducting a traffic stop."). Therefore, "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Toran's argument thus fails.

     ***Reasonable Suspicion***. Alternatively, an officer may initiate a brief investigative traffic stop when he has reasonable suspicion, "supported by articulable facts[,] that criminal activity may be afoot, *even if the officer lacks probable cause*." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted) (emphasis added). Reasonable suspicion requires "more than a mere hunch," *Navarette v. California*, 572 U.S. 393, 397 (2014), but rather that an officer have "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). This standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act," and "falls considerably short of 51% accuracy, for, as [the Supreme Court has] explained, to be reasonable is not to be perfect." *Kansas v. Glover*, 140 S.Ct. 1183, 1188 (2020) (cleaned up) (emphasis in original).

     Here, the government argues that, even if the Court negates the fact that Toran was driving a vehicle without a front license plate, the stop was still valid. When Trooper Theobald ran Toran's license plate, he noticed that the registered owner of the vehicle had an expired Ohio driver's license. The stop was thus also independently justified (the government contends) based on Officer Theobald's reasonable suspicion that Toran was operating a vehicle with a suspended or expired Ohio driver's license in

8

violation of Ohio law.[3]

"Not so," Toran argues, "as he had a valid Arizona license." (Motion to
Suppress, Doc. 66, Pg. ID # at 184.) Indeed, it does appear that Toran had a valid
Arizona driver's license at the time. But whether he had a valid out-of-state license is
irrelevant to whether Trooper Theobald had reasonable suspicion to believe that Toran
was violating Ohio law by driving in Ohio with a suspended or expired Ohio driver's
license.[4] Here, even if Toran was permitted to drive in Ohio with a valid Arizona
license but an expired Ohio license, reasonable mistakes of law do not merit
suppression of a traffic stop. *See Heien v. North Carolina*, 574 U.S. 54 (2014) (police
officer's reasonable mistake of law—that a broken brake light was a traffic infraction—
can still provide the individualized suspicion required to justify a traffic stop). And
regardless, the question is not whether Toran was "*actually* violating Ohio law by
operating a vehicle while his license was suspended," but rather "if it was reasonable
for Trooper Theobald to suspect that he was."

Conveniently, this question was answered just last year by the Supreme Court in
*Kansas v. Glover*, 140 S.Ct. 1183 (2020) (Thomas, J.). The Supreme Court was asked
"whether a police officer violates the Fourth Amendment by initiating an investigative
traffic stop after running a vehicle's license plate and learning that the registered owner
has a revoked driver's license." *Id*. at 1188. There, a Kansas patrol officer on routine

---

[3] *See* O.R.C. § 4510.11 ("Driving Under Suspension or in Violation of License Restriction.")

[4] *See* Transcript of 6/1/2021 Hearing on Motion to Suppress (Doc. 69 at 11:8-12, Pg. ID # 211) ("Q. So if
your license in Ohio is suspended or revoked, meaning your Ohio driver's license, but you have a valid
out-of-state [Arizona] license and you're stopped in Ohio, are you committing a violation? A. Yes.")

duty ran a vehicle's license plate and learned that the registered owner's license was revoked. The make and model of the registered vehicle matched that of the observed vehicle. So, without conducting any further investigation to determine if the owner of the vehicle was indeed driving, the officer pulled the car over. Based on those limited facts, the Supreme Court held that when an "officer lacks information negating an inference that the owner is driving the vehicle, an investigative traffic stop made after running a vehicle's license plate and learning that the registered owner's driver's license has been revoked is reasonable under the Fourth Amendment." *Id*. at 1185.

Applying that binding precedent here, the Court finds that the stop was justified. It is undisputed that Toran did not have an Ohio driver's license at the time. And there was no information that would negate Trooper Theobald's "commonsense inference that [Toran] was likely the driver of the vehicle, which," under *Kansas v. Glover*, "provided more than reasonable suspicion to initiate the stop." 140 S.Ct. at 1188. Yet Trooper Theobald then went one step further. Unlike the officer in *Glover*, he tried to confirm whether Toran was actually driving. He compared the driver of the car (Toran) with the BMV picture of the owner of the car (also Toran) and determined that Toran was in fact driving. That is more than enough to satisfy *Kansas v. Glover*.

\*     \*     \*

As such, the July 2018 Traffic Stop was independently justified for two reasons. First, Trooper Theobald had probable cause to believe that a civil traffic violation had occurred (driving without a front license plate in violation of O.R.C. § 4503.21(A)(1)). Second, he had reasonable suspicion of an ongoing crime (operating a vehicle with a

10

suspended or expired license in violation of O.R.C. § 4501.11). The traffic stop was lawfully initiated for either reason, regardless of whether the real purpose was law enforcement's hopes that narcotics or other contraband would be found in the vehicle.

### B. The Subsequent Search of the Vehicle

Toran next calls into question the second prong of the *Terry* stop analysis: "whether the degree of intrusion was reasonably related in scope to the situation at hand." *Davis*, 430 F.3d at 354. "Simply put, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*. (cleaned up). "For while a *Terry* stop may be constitutionally permissible initially, it may become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Id*.

Toran cites *Rodriguez v. United States*, 575 U.S. 348 (2015) and *United States v. Butler*, 223 F.3d 368 (6th Cir. 2000) in support of his contention that, here, the officers prolonged the traffic stop in order to conduct an unlawful drug investigation. He argues that:

> Trooper Theobald pulled the car over, and Toran complied. They asked for his license, and he gave them his Arizona license and insurance. The entire stop should have ended there. But they continued. They took Toran out of the car and patted him down for weapons. He had none. Again[,] should have been over. Yet still the officer[s] continued. They then took Deondre Chambers, who was in back right seat, out and frisked him, and officers recovered 5.756 grams of heroin from his person. They then continued and searched Toran's car [] and found 248.4 grams of heroin in the right rear seat where Deondre Chambers was sitting.

(Motion to Suppress, Doc. 66, Pg. ID # at 184-185.)

Toran's argument fails, however, because he omits the single most important fact: before Trooper Theobald "even made it up to the window," he "detected an overwhelming smell of [burnt] marijuana." (Transcript, Doc. 69, Pg. ID # 211; 213-221); (*see also* Resp. in Op., Doc. 68, Pg. ID # 195.) This fact alone was enough to justify the search. For as the Sixth Circuit has repeatedly held, the smell of marijuana omitting from a car—"by itself"—establishes probable cause to search the vehicle under the automobile exception to the warrant requirement. *See United States v. Elkins,* 300 F.3d 638, 659 (6th Cir. 2002) ("an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search"); *see also, e.g., United States v. McKinley*, 735 F. App'x 871, 873 (6th Cir. 2018) (collecting cases); *Elkins,* 300 F.3d at 659; *United States v. Bailey*, 407 F. App'x 27, 28–29 (6th Cir. 2011); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004). Accordingly, once Trooper Theobald smelled marijuana omitting from Toran's vehicle, he had probable cause to believe that drugs would be found inside. "This therefore turned [the] lawful *Terry* stop into a lawful search" under the automobile exception to the warrant requirement, *see Foster*, 376 F.3d at 588, and thus renders Toran's "reasonableness" argument irrelevant.

## C. Conclusion

In sum, the July 2018 Traffic Stop was reasonable under the Fourth Amendment. The initial stop was based on probable cause that a traffic violation had just occurred, reasonable suspicion that Toran was driving with an expired license, or both. Furthermore, the warrantless search of the vehicle was valid under the automobile

exception since there was probable cause to believe that drugs would be found inside.

## II.  Motion to Dismiss (Doc. 72)

In his second motion, Toran contends that this case should be dismissed based on the Government's failure to preserve and turn over video footage that may have been recorded by Trooper Theobald's front dash cam.  This argument implicates two related constitutional obligations of a prosecutor: (1) the duty to preserve evidence, and (2) the duty to disclose evidence.  The Court will first provide a brief background as to the law surrounding these two constitutional obligations, and then analyze Toran's arguments made thereunder.

### A. Background

Due process and the interests of fundamental fairness "require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  To safeguard this right, the Supreme Court has established "what might loosely be called the area of constitutionally guaranteed access to evidence." *Id.*  (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)).  Although most prominently associated with the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), this area of the law has developed considerably over the last 60 years, with various tests that apply under differing circumstances.

In *Brady*, the Supreme Court held that the government violates due process when "it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (Roberts, J.) (summarizing

13

*Brady* holding). The present case, however, involves two subsequent Supreme Court cases that fall under *Brady's* progeny. In *Trombetta*, the Supreme Court considered, for the first time, whether due process requires the government to take "affirmative steps to *preserve* evidence on behalf of criminal defendants." 467 U.S. at 486. The Supreme Court held that it did, but only when such evidence "might be expected to play a significant role in the suspect's defense." *Id.* at 488. Meanwhile, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court expanded upon *Brady* and held that the government's affirmative duty to disclose materially favorable evidence applies even when such evidence is "known only to police investigators and not to the prosecutor." *Id.* at 437-38. "This in turn means that the individual prosecutor has a duty to *learn* of any favorable evidence know to the others acting on the government's behalf in the case, including the police" and disclose it if material. *Id.* (emphasis added). And rightfully so. For these obligations "serve to justify trust in the prosecutor as the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.* at 439 (cleaned up) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

That said, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id.* at 436-37. Nor is the government required to retain and preserve *all* evidence that might be of conceivable significance. *See Richards v. Taskila*, No. 20-1329, 2020 WL 8024582, at *3 (6th Cir. Sept. 1, 2020) (Nalbandian, J.), *cert. denied*, 141 S. Ct. 1100, 208 L. Ed. 2d 548 (2021). Instead, and as discussed below, a due process violation generally only occurs if the

14

undisclosed or unpreserved evidence would have been "materially favorable to the accused," *see Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (*citing Brady*, 373 U.S. at 87), or, in some cases, "potentially useful." *See, generally, Arizona v. Youngblood*, 488 U.S. 51 (1988). For "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

### B. Failure to Preserve

First, Toran argues that this case should be dismissed based on the government's failure to preserve the dash cam footage. The Supreme Court has established two separate tests for determining whether the failure to do so amounts to a constitutional violation. "The first test, established in *California v. Trombetta*, applies in cases where the government fails to preserve material exculpatory evidence, while the second test, established in *Arizona v. Youngblood*, applies in cases where the government fails to preserve 'potentially useful' evidence." *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015) (cleaned up) (emphasis added). "[F]ailure to preserve the former violates due process regardless of the government's good or bad faith." *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (Sutton, J.) (cleaned up). "But destruction of the latter offends due process only if done in bad faith." *Id.*

As an initial matter, it is unclear whether the dash cam footage at issue here ever even existed.[5] Nevertheless, even if it had, Toran still must demonstrate that it is either

---

[5] As discussed above, Trooper Theobald testified under oath that he believed that the dash cam "either malfunctioned or did not come on." (*See* Facts Sections, p. 4-5) (*citing* Transcript, Doc. 69, Pg. ID # 207.)

"materially exculpatory" or "potentially useful." Again, destruction of "potentially useful" evidence offends due process *only* if done in bad faith. *Folad*, 877 F.3d at 253. Yet Toran readily concedes that "[n]o bad faith is alleged towards the government." (Motion to Dismiss, Doc. 70, Pg. ID # 251.) So, the "potentially useful" test is out.

That leaves us with the "materially exculpatory" test. To succeed here, Toran must show that (1) the missing dash cam footage was material and exculpatory, (2) its exculpatory value was apparent at the time of its destruction, and (3) he is unable to obtain comparable evidence by other reasonably available means. *See Trombetta*, 467 U.S. at 489. "Exculpatory evidence" is, of course, "evidence tending to establish a criminal defendant's innocence." *Exculpatory Evidence*, Black's Law Dictionary (10th ed. 2014). Evidence is "material," in the *Brady* context, only when there is a "'reasonable probability' that, had [it] been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (citations omitted). "A reasonable probability of a different result" is one in which the missing evidence sufficiently "undermines confidence in the outcome." *Id*.

Toran, however, fails to explain how the missing dash cam footage is either material or exculpatory. Instead, he merely states that the video "would show the encounter[,] that Mr. Toran complied with the officer's instructions, and that the officer exceeded the permissible actions under *Terry*, as argued in the motion to suppress." (Motion to Dismiss, Doc. 70, Pg. ID # 251.) But the facts surrounding the traffic stop are

---

Although Trooper Theobald acknowledged that it was "possible" that footage of the July 2018 Traffic Stop was recorded, he believed it was "unlikely." (*Id*.)

largely undisputed. Here, the Court must consider the materiality of the missing dash

cam footage "in the context of the entire record," *Turner*, 137 S.Ct. at 1893 (cleaned up),

"collectively, not item by item." *Hughbanks v. Hudson*, 2 F.4th 527, 536 (6th Cir. 2021)

(cleaned up). And then, "in light of that examination," determine "whether there is a

reasonable probability that, had the evidence been disclosed, the result of the

proceeding would have been different." *Turner*, 137 S. Ct. at 1893 (cleaned up). Indeed,

Toran complied with the officer's instructions. In this case, while dash cam footage

might serve to confirm this fact (which the government notably does not contest), it

would not have any impact on the single most dispositive fact here: the

"overwhelming" smell of marijuana. Toran does not deny or dispute that the troopers

found burnt marijuana blunts in the driver's seat/center console ashtray. Nor does he

contest any of the following testimony proffered by Trooper Theobald:

> Immediately upon walking up on the vehicle, there was a[n] overwhelming
> smell of marijuana coming from the vehicle. As I was talking with Mr.
> Toran, he coughed multiple times. It was almost as if they had been
> smoking marijuana as I was getting ready to stop them. And before I even
> questioned him about the smell, he told me, he said, "We've been -- we've
> been smoking marijuana in the vehicle."

(Transcript, Doc. 69 at 9:15-21, Pg. ID # 209.) Video footage from the front dash cam

could not rebut this testimony, nor could it be used to disprove the fact that probable

cause was unquestionably imbued the instant Trooper Theobald detected the

"overwhelming" scent of marijuana. Simply stated, even if video footage from the front

dash cam ever existed, it wouldn't be material

In fact, any potentially recorded video footage—which captures Toran being

arrested *at* the scene of the crime—is more likely to confirm Toran's guilt than establish his innocence (*e.g.*, if it showed smoke billowing out of the vehicle's windows).  *See Folad*, 877 F.3d at 253 (lost ATM logs "were more likely to confirm [defendants'] guilt than to establish their innocence" and "likely would have confirmed the fraudulent nature" of their actions); *United States v. Smith*, 2021 WL 197160, at *6 (E.D. Tenn. Jan. 20, 2021) (in nearly identical case, the district court found it "questionable whether [dash cam] recordings [of a traffic stop] are exculpatory at all considering it is video and audio evidence of Defendant at the scene of the crime.").  The video is therefore not only immaterial, but its exculpatory value is questionable, at best.  And further, since its exculpatory value "is in question now, it certainly can't be said that the value of the evidence was readily apparent when it was lost."  *Id.*; *see also id.* at *7 ("If the evidence is not material, then the evidence's exculpatory value is in question, making it impossible to say that exculpatory value was readily apparent when it was lost.") (citing *Trombetta*, 467 U.S. at 489).

Lastly, as to the third prong, the video must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Trombetta*, 467 U.S. at 489.  "Under *Trombetta,* though, all that matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence."  *Elmore v. Foltz*, 768 F.2d 773, 778 (6th Cir. 1985).  And under similar circumstances, both the Sixth Circuit and our sister courts have held that eyewitness testimony and cross-examination of the government's witnesses qualify as "comparable evidence."  *Id.*; *see also, e.g.*, *United States v. Gaither*, 65

18

F. App'x 514, 517 (6th Cir. 2003) ("the nature of the evidence was not such that [Defendant] was unable to obtain comparable evidence by other means" when he "testified at trial and presented to the jury his contention that the missing audiotape contained exculpatory evidence. . . [and] cross-examin[ed] the government's witnesses."); *Palmer v. Allen*, 2016 WL 3405872, at *11 (E.D. Mich. June 21, 2016) (Defendant's "own allegations and testimony confirm that he has the ability to obtain comparable evidence through other means, namely the testimony. . . of witnesses [to] the events.").

Toran has access to the same such "comparable evidence" here. Trooper Theobald has already testified and been cross-examined about the traffic stop. Toran could call him to testify again at trial (or, alternatively, cross-examine him if he is called by the government) or he could call Trooper Doebrich (who arrived on the scene as back-up) to testify. Toran could also testify himself. Or he could call either (or both) of the two other individuals sitting in the car beside him—his brother Justin or co-defendant Deondrea Chambers. Indeed, while video footage of the traffic stop may be preferable, *see Foltz*, 768 F.2d at 778 ("[o]bviously, no better tool exists for impeaching [a witness] than a tape directly contradicting [that witness]"), it simply cannot be said that Toran is "unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.

In short, Toran's argument fails at each step of the *Trombetta* test. The potentially recorded video is immaterial since it would have no impact on the outcome of this

19

matter, its exculpatory value is questionable both now and at the time of its (potential)

destruction, and other comparable evidence is reasonably available.

### C. Failure to Disclose

Lastly, Toran argues that by failing to disclose the dash cam footage the

government violated its obligations under *Brady*. The Supreme Court has held that:

> There are three components of a true *Brady* violation: [1] The evidence at
> issue must be favorable to the accused, either because it is exculpatory, or
> because it is impeaching; [2] that evidence must have been suppressed by
> the State, either willfully or inadvertently; and [3] prejudice must have
> ensued.

*Greene*, 527 U.S. at 281-82. "The third prong, prejudice, is sometimes referred to as the

'materiality' requirement." *Hughbanks*, 2 F.4th at 536 (cleaned up); *see also Turner*, 137

S.Ct. at 1893 ("In other words, petitioners here are entitled to a new trial only if they

establish the prejudice necessary to satisfy the 'materiality' inquiry."). Again, in the

context of *Brady*, evidence is "'material' only if there is a 'reasonable probability' that,

had the evidence been disclosed to the defense, the result of the proceeding would have

been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Toran's *Brady* argument fails, however, for the same reasons as his failure-to-

preserve argument. As discussed above, the video is not only immaterial, but its

exculpatory value is highly questionable. In short, the Court must evaluate the missing

dash cam video "in the context of the entire record," and determine in light of that

examination whether "there is a reasonable probability that, had [it] been disclosed, the

result of the proceeding would have been different." *Turner*, 137 S. Ct. at 1893 (cleaned

up). The Court finds that there is not.

## CONCLUSION

For the reasons above, Defendant Donald Toran's motion to suppress (Doc. 66) and motion to dismiss (Doc. 70) are both **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

21